# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Bankruptcy No. 16-20747-CMB |
| ERICA LYNN MILTON, | Chapter 7 |
| Debtor. | |
| GERALD S. LEPRE, JR., | |
| Plaintiff, | Adv. Proc. No. 16-2127-CMB |
| v. | |
| | Related to Doc. No. 67 |
| ERICA LYNN MILTON, | |
| Defendant. | |

*Appearances*: Gerald S. Lepre, Jr./Plaintiff, pro se
Calaiaro Valencik for Defendant/Debtor, Erica Lynn Milton

## MEMORANDUM OPINION

The matter before the Court is the *First Amended Adversary Complaint* ("Amended Complaint," Doc. No. 67) filed by Gerald S. Lepre, Jr., against Erica Lynn Milton ("Debtor"). Within the Amended Complaint, Mr. Lepre objects to the Debtor's discharge pursuant to 11 U.S.C. §727(a)(4)(A) and alternatively asserts that the debt owed to him is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4), and (a)(6).[1] For the reasons set forth herein, this Court finds that Mr. Lepre failed to meet his burden under the applicable statutes.

---

[1] Pursuant to 28 U.S.C. §§1334 and 157, this Court has subject matter jurisdiction over this proceeding. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I)-(J).

1

Background and Procedural History

Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on March 3, 2016. Mr. Lepre commenced the instant adversary proceeding on June 17, 2016, alleging that Debtor denied him the opportunity to retrieve his property from the residence they formerly shared and seeking various forms of relief. Although it appeared the parties might reach a resolution through mediation, mediation ultimately proved unsuccessful. Mr. Lepre's Amended Complaint followed.

In response to the filing of the Amended Complaint, Debtor filed a *Motion to Request a More Specific Pleading Under Bankruptcy Rule 7009(b) and Motion to Dismiss Amended Complaint Under Bankruptcy Rule 7012(b)*. By Memorandum Order dated June 15, 2017, said motion was granted in part and denied in part. Count II was dismissed; however, the Amended Complaint was to proceed as to Count I, an objection to Debtor's discharge pursuant to 11 U.S.C. §727(a)(4)(A), as well as Counts III, IV, and V, objecting to the dischargeability of the debt owed to Mr. Lepre pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4), and (a)(6). Debtor filed an Answer on July 3, 2017.

Preceding trial, the parties filed individual pretrial statements (Doc. Nos. 182 and 200) as well as a *Joint Statement of Stipulated Facts* ("Stipulated Facts," Doc. No. 193). Following a number of discovery disputes, motions to compel, and other delays, trial was held on September 21, 2018. In addition to testimony from the Debtor and Mr. Lepre, the Court heard the testimony of Jessica Weiss, Mr. Lepre's fiancé, and Carol Milton, the Debtor's mother. While the Court found the testimony of Ms. Weiss and Ms. Carol Milton generally credible, the most relevant testimony was that of the Debtor and Mr. Lepre. Following the one-day trial, the parties filed their

2

proposed findings of fact and conclusions of law (Doc. Nos. 219[2] and 224). The matter is now ripe for decision.

## Findings of Fact

In 2001, Debtor purchased her home located at 130 Clara Street, Millvale, Pennsylvania (the "Clara Street Property"), and only her name is on the deed. *See* Transcript of 9/21/18 ("Transcript"), Doc. No. 213, at 112, 148, 150-51. In November of 2009, Mr. Lepre moved into the Clara Street Property. *See* Stipulated Facts, at ¶1. At some point, the parties were engaged to be married, and they lived together as a family unit for several years. *See* Transcript, at 102, 136. As is common with parties in a serious relationship, they shared the costs of some expenses, took vacations together, exchanged gifts, and even opened a joint bank account. Transcript, at 112-13, 132, 153-54. During that time, Mr. Lepre took it upon himself to replace the home's gravel driveway with a concrete driveway and constructed a shed on the property, primarily for the storage of his motorcycles and some other items. Transcript, at 34, 102-03, 135, 148. Eventually, however, the relationship became volatile. *See* Transcript, at 40-41, 141-146. According to the Debtor's credible testimony, Mr. Lepre threatened her with lawsuits, alleging he would take everything from her including her home, and she could not get rid of him. Transcript, at 142. Ultimately, tensions rose to a breaking point.

Debtor credibly testified that, following a heated argument with Mr. Lepre, her stepfather offered to take Mr. Lepre and his belongings back to Scranton, Pennsylvania, where Mr. Lepre formerly resided. Transcript, at 144-45. Mr. Lepre refused the offer. Transcript, at 145.[3] Debtor

---

[2]  Attached to Mr. Lepre's filing is a document identified as a transcript of trial transcribed by Ms. Weiss. Notably, a transcript of trial was ordered by this Court and docketed in this proceeding on November 7, 2018 (Doc. No. 213).

[3]  The Court finds Mr. Lepre's testimony to the contrary is not credible. *See* Transcript, at 120 (alleging that it was Debtor's father who refused Mr. Lepre's request to assist him in moving his items back

and her daughter left the Clara Street Property on February 28, 2015, to stay with Debtor's parents. *See* Stipulated Facts, at ¶2; Transcript, at 145. Debtor credibly testified that, during this time, she was providing Mr. Lepre with the opportunity to find another place to live. Transcript, at 145. However, based upon what Debtor perceived to be threatening behavior, on March 9, 2015, Debtor filed a Petition for Protection from Abuse ("PFA") against Mr. Lepre. *See* Transcript, at 145; Stipulated Facts, ¶3. Thereafter, a Protection from Abuse Order was entered against Mr. Lepre. *See* Stipulated Facts, ¶¶4, 7, 9.

Between February 28, 2015, and March 15, 2015, Mr. Lepre had exclusive possession of the Clara Street Property. *See* Stipulated Facts ¶8; Transcript, at 97.[4] According to Mr. Lepre, when he was served with the order entered on the PFA, he was forced to leave the Clara Street Property with only a motorcycle, a bookbag full of clothing, and a dog. Testimony, at 97-98, 133. While the filing of the PFA may have been unexpected, the credible evidence establishes that Mr. Lepre knew he was to make other living arrangements and move out of the Clara Street Property during Debtor's absence from her home. Transcript, at 120, 145. In fact, it was the *purpose* for her absence. Whether Mr. Lepre took any action in furtherance of making such arrangements cannot be determined from the credible evidence. However, based upon the testimony, the Court will not rule out the possibility that Mr. Lepre may have acted in accordance with his best interests by removing items from the Clara Street Property during that time.

With respect to the PFA, a negotiated consent order ("PFA Order") was entered requiring the parties to coordinate with respect to Mr. Lepre's retrieval of his belongings from the Clara

---

to Scranton). Nonetheless, even Mr. Lepre's testimony demonstrates his knowledge that his residence at the Clara Street Property was coming to an end.

[4] There appears to be some internal inconsistency within the Stipulated Facts regarding whether Mr. Lepre had exclusive possession until March 15, 2015, or whether Debtor, in fact, returned on March 12, 2015. *See* Stipulated Facts, ¶¶4-6, 8. The inconsistency, however, is not material to this Opinion.

4

Street Property.[5] Pursuant to the order, Mr. Lepre was permitted to contact Debtor solely for the purpose of making arrangements to retrieve his property. Transcript, at 119, 146. Pending the coordination of a date for retrieval, the Debtor removed the lock Mr. Lepre had placed on the shed he constructed at the property and began to move his remaining possessions from inside the home to that location. *See* Transcript, at 34-35. While Mr. Lepre agrees that Debtor accepted text messages from him for a certain period of time, he contends that she subsequently changed her telephone number. Transcript, at 98. However, Debtor credibly testified that Mr. Lepre failed to comply with the terms of the PFA Order to retrieve his belongings and she perceived Mr. Lepre's conduct as threatening. *See* Transcript, at 79-81, 146-48. Accordingly, Mr. Lepre's possessions remained in the shed. Transcript, at 147-50.

On June 24, 2015, Mr. Lepre commenced an action in replevin seeking to retrieve certain items from the Clara Street Property as well as to recover his alleged interest in the real property. *See* Stipulated Facts, ¶11. Debtor filed an answer. *See* Stipulated Facts, ¶12. Subsequently, Mr. Lepre filed an amended complaint. *See* Stipulated Facts, ¶13. On November 24, 2015, Mr. Lepre entered judgment by default in the amount of $71,700.00 due to Debtor's failure to file an answer to the amended complaint. *See* Stipulated Facts, ¶14; Transcript, at 99, 130. Thereafter, Mr. Lepre filed a writ of execution in the replevin action. *See* Stipulated Facts, ¶15. On April 21, 2016, he filed a motion for supplemental relief in aid of execution of his writ. *See* Stipulated Facts, ¶16.

---

[5] The parties stipulated as follows: "A negotiated consent Order was entered by the Protection from Abuse Act Court on March 20, 2015, wherein, Debtor was required to coordinate with the Plaintiff on retrieval of his property located at 130 Clara Street, Millvale, Pennsylvania, 15209." *See* Stipulated Facts, ¶9. There appears to be some confusion regarding the dates of the orders entered in that matter. Notably, despite extensive testimony regarding the terms of the orders relating to the PFA, neither of the parties moved for their admission into evidence at trial. The Court notes Debtor's inclusion of the *May* 20, 2015 order in Debtor's exhibit binder (marked as Exhibit C) and Mr. Lepre's inclusion of an order dated March *16*, 2015, as an attachment to his Amended Complaint. Notwithstanding the foregoing, Mr. Lepre cites to the March 16, 2015 Order in support of a number of his proposed findings of fact. *See* Doc. No. 219.

Days later, having filed her bankruptcy petition on March 3, 2016, Debtor filed a Suggestion of Bankruptcy in that action. *See* Stipulated Facts, ¶17. Accordingly, Mr. Lepre's actions in that proceeding were stayed.

During the course of these proceedings, having been advised that certain items belonging to Mr. Lepre remained at the Clara Street Property, this Court sought to resolve some of the issues between the parties. Therefore, pursuant to this Court's directive, a time was set up for retrieval of undisputed items. Transcript, at 91, 150. Debtor also agreed to turn over some previously contested items simply to avoid further disputes, including a Honda Elite Scooter which was obtained while the parties were living together. *See* Transcript, at 24-26, 37-38, 115.[6]

In February 2018, Mr. Lepre and his fiancé, Ms. Weiss, went to the Clara Street Property for the purpose of collecting the undisputed items as well as items Debtor agreed to turn over. Transcript, at 91. At that time, Mr. Lepre also sought to remove a Harley Davidson sign hanging on the wall of the shed and a shop light which appears to be installed in the shed. *See* Transcript, at 91-92, 100, 124; Exhibit 15. According to Debtor, although she did not claim ownership of these items, neither was identified on the list of items Mr. Lepre was to collect on that date, and Debtor did not permit Mr. Lepre to remove those items. Transcript, at 60-63.[7] Notably, Ms. Weiss' testimony supports Debtor's characterization of the limited exchange of property that was to take

---

[6] In her Amended Schedules, Debtor identified having an interest in the scooter. *See* Exhibit B. According to Debtor, she had an agreement to purchase the scooter and she made payments toward the purchase price. Transcript, at 24. While Debtor conceded that title of the scooter was in Mr. Lepre's name, consistent with her testimony at the Meeting of Creditors, Debtor asserted that Mr. Lepre underhandedly obtained title of the scooter. *See* Exhibit 20; Transcript, at 25-29. The Court need not resolve the issue as Mr. Lepre received the scooter. Transcript, at 115.

[7] Mr. Lepre, to the contrary, asserts that these items were identified on the list. Transcript, at 100. It is not clear whether the list used on that date is the same as the list of items introduced as a trial exhibit and this Court draws no conclusions on whether these items were identified in some manner. *See* Transcript, at 31-33. Notably, Debtor's position regarding these relatively minor items seems counterproductive considering her apparent goal of cutting ties with Mr. Lepre. Nonetheless, it is characteristic of their contentious relationship.

6

place that day. Specifically, Ms. Weiss testified that she and Mr. Lepre went to the Clara Street Property that day to collect items identified on a list and that list was determinative of what to take and what not to take. *See* Transcript, at 91.

Aside from some disputed items, when asked if Mr. Lepre took everything that he thought was his, Ms. Weiss responded: "That we were advised, yes. There was a large garbage can that we were advised that, you know, there was tools and stuff in there. *So we assumed that was – the stuff on the list was in that garbage can*." Transcript, at 93 (emphasis added). Thus, it is the testimony of Ms. Weiss that she and Mr. Lepre did not verify the contents of the items they were removing from the shed.[8] According to Ms. Weiss, however, she and Mr. Lepre later discovered that they did not obtain all the items that they intended to collect. Transcript, at 94. Accordingly, from this testimony it appears the Court is to conclude that Debtor either purposefully withheld items from Mr. Lepre that should have been turned over on that date *or* otherwise disposed of the property. Neither conclusion is supported by credible evidence.

Notably, it defies logic to believe that Mr. Lepre simply relied upon Debtor's representations regarding the contents of any container. At this point in time, only suspicion and mistrust existed between these parties. If it is true, as Mr. Lepre describes it, that he has continuously sought this opportunity to retrieve his property, the Court finds this account of Mr. Lepre's reliance on Debtor's alleged representations to be implausible. *See* Transcript, at 103-04. Further, if Mr. Lepre suspected that he was not collecting all the items he left behind at the Clara Street Property, this Court finds that he did not seek to look beyond the contents of the shed.

---

[8] This is consistent with statements and representations made on the record by Mr. Lepre. *See* Transcript, at 11 ("All the boxes were boxed up, sealed, so you really couldn't see in it. I just wanted to get out of there."); *See also* Transcript, at 67.

7

Transcript, at 150.[9] Notably, to the extent that the property collected by Mr. Lepre was incomplete, he suggests Debtor sold his property. Transcript, at 135. There is simply no credible evidence to support this assertion.

With respect to the property that Mr. Lepre did retrieve, he characterized the items as a "load of garbage" that had been kept in the corner of the leaking shed. Transcript, at 101. Notably, the shed was not a sealed structure. Transcript, at 44. As described by Mr. Lepre, he constructed it as a temporary garage. *See* Transcript, at 135. Eventually, over time, the roof of the shed began to leak. Transcript, at 44. To the extent items were exposed to the elements, there is no indication that Debtor purposefully placed Mr. Lepre's items in such a way that they would be damaged or that Debtor had any expectation that the property would remain in the shed for years after Mr. Lepre's departure. Further, even according to Mr. Lepre, he could not say whether Debtor's intention was to place his property where the shed was leaking. Transcript, at 101.

At trial, Mr. Lepre produced a list of fifty-three items allegedly belonging to him which he contended were left at the Clara Street Property when he vacated. *See* Exhibit 23. Some of these items were among the property collected by Mr. Lepre in February 2018. As identified by Mr. Lepre at trial, the list was filed with his complaint in the Court of Common Pleas of Allegheny County, presumably as part of the replevin action against Debtor. *See* Transcript, at 32-33.[10] Mr. Lepre went over nearly all of the items individually at trial with the Debtor. While Debtor remembered certain items that she placed in the shed after Mr. Lepre vacated the Clara Street

---

[9] The Court finds Mr. Lepre's testimony indicating first that his access to the home was never discussed and then asserting that he was limited to the shed to be inconsistent and therefore not credible. Transcript, at 134-35. *See also* Testimony of Ms. Weiss, Transcript, at 93 ("A. So we were advised that all of the belongings were put into the shed. So we did not go further into the house. Q. Okay. But if he had asked, do you know if he would have been denied access? A. I can't tell you that.").

[10] In his proposed findings of fact, Mr. Lepre identifies the list as made by himself *and the Debtor*. *See* Doc. No. 219, at ¶37. However, there is no evidence in support of this assertion, and it is inconsistent with the identification of the list at trial. *See* Transcript at 30-33.

8

Property in 2015, she was unable to recall every specific item from tie clips to galoshes that were packed away years prior to the trial. Transcript, at 50-51. The Court finds Debtor's testimony regarding her recollection of items generally credible and devoid of any indication of intentional deceit.

Notably, Mr. Lepre seems to demand that he is entitled to the return or repayment of every contribution he made during the course of the parties' relationship simply because the relationship ended. For example, Mr. Lepre seeks the return of a turbocharger installed in Debtor's vehicle, the value of the concrete driveway which Mr. Lepre himself described as a "labor of love,"[11] and a Keurig coffeemaker purchased as a gift. Transcript, at 41-42, 103, 118, 125. The Court also notes that there was extensive testimony regarding a washing machine purchased while the parties lived together. Mr. Lepre produced a two-page receipt from Sears and testified that his credit card was used for the purchase. *See* Transcript, at 125-27; Exhibit 9. Notably, the appliance was delivered to the parties' previously shared address and the purchaser is identified as Erica Milton on the second page of the receipt. Nonetheless, as the washing machine no longer functioned and Mr. Lepre was compensated through an insurance policy, there appears to be no basis to seek return of the washing machine itself or its value from the Debtor. Transcript, at 127-28.[12]

Aside from the items that were collected by Mr. Lepre, the ownership of several items remained in dispute at the time of trial. Based upon the credible testimony, however, the Court

---

[11] Notably, on Exhibit 23, it appears Mr. Lepre values the driveway and shed at $15,000.00. There is no evidence that Debtor ever requested the construction of either the driveway or the shed. Rather, the credible evidence establishes that Mr. Lepre installed both primarily for his own benefit without any contract or promise of repayment from Debtor. *See* Transcript, at 103, 117-118, 148.

[12] The Court notes that the parties clearly communicated after an order was entered on the PFA. *See* Transcript, at 79-81. To the extent Mr. Lepre asserts that Debtor made a claim related to the washing machine on a policy purchased by Mr. Lepre, Debtor credibly testified that she had his permission to file the claim. Transcript, at 78-80. Ultimately, however, as Mr. Lepre received payment through an insurance claim, the Court finds the testimony to be irrelevant.

9

finds that Debtor collected the items she believed belonged to Mr. Lepre from the residence and placed them in the shed at the Clara Street Property awaiting the coordination of a date and time for retrieval pursuant to the PFA Order. After these proceedings commenced, Debtor made available to Mr. Lepre the items that were identified as undisputed. To the extent Mr. Lepre asserts items were missing, there is no credible evidence to support the allegation that Debtor sold or otherwise disposed of items belonging to Mr. Lepre in between his expulsion from the residence in March 2015 and February 2018 when Mr. Lepre and Ms. Weiss appeared to collect Mr. Lepre's property. Likewise, no credible evidence was presented to establish that Debtor damaged or otherwise caused harm to Mr. Lepre's property while it remained at the Clara Street Property.

## Conclusions of Law

At the outset, the Court will briefly address the parties' contentions regarding the default judgment entered in the state court proceeding. Mr. Lepre asserts Debtor is attempting to nullify or invalidate the default judgment in this bankruptcy case. To be fair, Debtor has argued before this Court that the default judgment was not a proper judgment. Notably, however, Debtor apparently took no action in the state court to appeal or vacate that judgment. Further, the validity of that judgment is not, nor should it be, before this Court. Rather, it is uncontested that Mr. Lepre obtained a default judgment against Debtor in the amount of $71,700.00 in the prepetition replevin action. The issue *here* is whether Debtor will remain personally liable for the debt. At the time the default judgment was entered, the issue of dischargeability was clearly not raised or determined and thus claim preclusion (i.e., *res judicata*) does not apply. *See American Asset Finance, LLC v. Feldman* (*In re Feldman*), 500 B.R. 431, 439 (Bankr.E.D.Pa. 2013). Further, collateral estoppel is also inapplicable with respect to the default judgment as issues must have been actually litigated in order to be given preclusive effect. *See Pogonovich v. Bertolotti* (*In re Bertolotti*), 470 B.R. 356,

360 (Bankr.W.D.Pa. 2012). Thus, the dischargeability of the debt remains an issue for this Court to determine based upon the evidence presented at trial.

The Court begins with an analysis of §727(a)(4)(A), as denial of the Debtor's discharge would eliminate the need to consider whether the debt owed to Mr. Lepre is otherwise nondischargeable pursuant to §523. Notably, denial of a discharge should only be granted in extreme circumstances. *See Melaragno v. Lybrook* (*In re Lybrook*), 544 B.R. 537, 543 (Bankr.W.D.Pa. 2015). Mr. Lepre bears the burden of proof, by a preponderance of the evidence, as to his objection to Debtor's discharge. *See id.*

Pursuant to §727(a)(4)(A), a debtor is not entitled to a discharge if "the debtor knowingly and fraudulently, in or in connection with the case – made a false oath or account." To succeed, Mr. Lepre must prove the following elements:

   (1) the debtor made a statement under oath;
   (2) the statement was false;
   (3) the debtor knew the statement was false;
   (4) the debtor made the statement with the intent to deceive; and
   (5) the statement related materially to the bankruptcy case.

*See Lybrook*, 544 B.R. at 544.

As to the first element, Mr. Lepre relies upon statements contained within Debtor's Schedules and Statement of Financial Affairs ("SOFA"). These are statements made under oath and thus can lead to denial of a discharge for the purpose of §727(a)(4)(A). *See Lybrook*, 544 B.R. at 544.

With respect to the second element, when asked at trial to identify the allegedly false statements made in Debtor's Schedules and SOFA, Mr. Lepre asserted that Debtor incorrectly represented (1) property that belonged to him as her own; (2) whether she held or controlled property owned by someone else; and (3) the value of her home. While the first two allegations

11

require additional analysis, the Court can quickly dispose of the third alleged falsehood. No credible evidence was presented to challenge Debtor's valuation of her home. Mr. Lepre offered only his unsubstantiated belief that the value was misrepresented, which is insufficient to meet his burden as to this element. Transcript, at 116.

With respect to the remaining allegations, it is Mr. Lepre's contention that the Debtor failed to disclose that she held an extensive amount of *his* property at the time of the filing and further misrepresented certain items as her own. Accordingly, Mr. Lepre asserts Debtor's statements were false statements. However, to meet the applicable test, Mr. Lepre must establish that the statements were false *and* Debtor *knew* the statements were false.

With respect to much of the property at issue, there was a dispute between the parties as to ownership. *See* Transcript, at 23-24; Exhibit 20.[13] As the testimony clearly established, the parties previously resided together, were engaged to be married, purchased items for the home they shared together, and exchanged some gifts during that period of time. Further, according to Mr. Lepre, he made contributions toward the home and vehicle during the time he resided at the Clara Street Property. *See* Transcript, at 112. Thus, as to much of the property, the Court finds that, even if the statements were false, Mr. Lepre failed to prove the third element of the test, that is, whether the Debtor *knew* her statements to be false. Based upon the credible testimony, whether Debtor was correct in her belief or not, Debtor truly believed that the items she identified as her own were, in fact, her possessions. As such, Debtor had an obligation to disclose all assets which she believed belonged to her. Further, to the extent Debtor subsequently agreed during the course of this litigation to turn over some items to Mr. Lepre, the Court is unconvinced that Debtor's subsequent

---

[13] In his exhibit list, Mr. Lepre identifies Exhibit 20 as a transcript of the Meeting of Creditors; however, as indicated by the cover sheet, the Office of the United States Trustee provides only digital recordings, not transcripts. Nonetheless, no objection was raised by Debtor as to the accuracy of Exhibit 20, which has been admitted into evidence.

actions undermine her statements at the time of the completion of the Schedules and SOFA. As per her credible testimony, Debtor agreed to turn over certain items to resolve matters.

This, however, does not account for a lesser number of items indisputably belonging to Mr. Lepre which remained at Debtor's property. These items consisted of such things as decals, an air compressor, motorcycle models, hats, clothing, and an umbrella. Despite the foregoing, within her SOFA, Debtor indicated "No" in response to the following question: "Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone." *See* Exhibit A. Mr. Lepre contends that this is a false statement and Debtor knew it to be false. This conclusion, however, is not as simply reached as Mr. Lepre contends.

At the Meeting of Creditors held May 23, 2016, Mr. Lepre appeared to ask Debtor questions. *See* Exhibit 20. At that time, Debtor acknowledged that some of Mr. Lepre's property remained at the Clara Street Property:

> G: Do you remember what I sued you for?
> A [sic]: Because you violated a PFA order in order to obtain a few of your items that were left at my home and you did not follow the protocol of those orders and you continue to harass me going this route.
> G: Were any of those items ever returned?
> E: There is a PFA that you did not follow protocol to get.
> G: Answer the question Ms. Milton.
> E: No, there are three things that are sitting there.[14]
> G: Three things? How long did I live with you?

*See* Exhibit 20. According to Debtor, she did not believe she was "holding" Mr. Lepre's property; rather, she contended the property was readily available to him as long as he complied with the

---

[14]   The Court notes that Mr. Lepre has placed significant emphasis on this response, specifically the identification of "three things." *See* Transcript, at 100. Mr. Lepre has argued that this statement too is false. Notably, however, the response is vague and appears to be nothing more than a generalization. When pressed further at the Meeting of Creditors, Debtor's responses indicate that she did not know how much property belonging to Mr. Lepre remained at the residence. The Court finds no evidence of deception or concealment. As the Court has observed, many of the items Mr. Lepre claimed were disputed by Debtor.

13

PFA Order. *See* Exhibit 20; Transcript, at 149-50. Debtor's position at trial appears consistent with her position at the Meeting of Creditors and her answer in her SOFA.

Following the PFA Order, Debtor collected everything from her home that she believed might belong to Mr. Lepre and moved those items to the shed. Debtor credibly testified that she was willing to turn over the items; however, arrangements were never appropriately made in accordance with the PFA Order. Accordingly, the property remained in Debtor's shed for years. Undoubtedly, the disputed items seemed to overshadow the items that could have been easily returned to Mr. Lepre that were simply out of sight, out of mind of the Debtor, awaiting Mr. Lepre's compliance with the PFA Order. At most, the Court finds this was an inadvertent misrepresentation.

Nonetheless, e*ven if* the Court were to find that Debtor knowingly made a false statement in her SOFA as Mr. Lepre contends, the Court must assess if Debtor made the statement at issue with the intent to deceive. Based upon the credible testimony and evidence, the Court finds she did not. "Fraudulent intent may be proven by circumstantial evidence or inferred from a pattern of nondisclosure and concealment." *See Giansante & Cobb, LLC v. Singh* (*In re Singh*), 433 B.R. 139, 154 (Bankr.E.D.Pa. 2010). As set forth above, Debtor readily disclosed at the Meeting of Creditors that some of Mr. Lepre's items remained at the Clara Street Property. Thus, when clarification was sought, Debtor disclosed rather than concealed information. Also, within her SOFA, Debtor identifies the replevin action and provides that a default judgment was entered on November 24, 2015, in the amount of $71,700.00 in favor of Mr. Lepre in the Court of Common Pleas of Allegheny County. Accordingly, by identifying the judgment as resulting from an action in *replevin*, notice was clearly provided of Mr. Lepre's claim of ownership of some property in Debtor's possession. This weighs against a finding of an intention to deceive. Further, the Court

14

finds no intent to deceive Mr. Lepre. He was clearly aware that the parties never coordinated a time for the return of the remaining, undisputed property. Based on this record, there is no pattern of nondisclosure or evidence of reckless disregard for the truth indicative of an intent to defraud. *Cf. Lybrook*, 544 B.R. at 546.

Having found the Debtor lacked intent to deceive, the Court could conclude its analysis under §727(a)(4)(A). However, it is notable that Mr. Lepre also failed to meet his burden under the final element of the test addressing materiality of the statement.

> This requirement obviously is designed to screen out cases involving *de minimus*, trivial or completely irrelevant falsehoods that could otherwise cause a debtor to be denied a discharge. The test for materiality is "whether the subject matter of the false oath 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."

*Lybrook*, 544 B.R. at 548 (internal citation omitted). While a statement may be technically false, it is proper to consider "the degree to which, if any, that misstatement impeded the proper administration of the bankruptcy case." *In re Singh*, 433 B.R. at 156.

Here, the items at issue are the personal property of Mr. Lepre which remained in the shed at the Clara Street Property for several years.[15] To be clear, there is a distinction between the items that Debtor eventually agreed to turn over to Mr. Lepre for closure and convenience versus the uncontested items. There has been no attempt to demonstrate how the Debtor's statement obstructed, in any way, the efforts of the trustee or creditors to investigate Debtor's financial affairs. *See Singh*, 433 B.R. at 156. Based on the foregoing, Mr. Lepre has not established

---

[15] The Court briefly notes Mr. Lepre's additional allegation that the statement in Debtor's SOFA was also false due to property in the shed belonging to Debtor's friend and her brother. With respect to the items belonging to her friend, Debtor credibly testified that those items were not in the shed at the time she completed her SOFA. Transcript, at 61. With respect to the items that remained at Debtor's residence from when her brother previously resided there, the Court's analysis set forth above equally applies, and the Court finds no basis to deny the Debtor's discharge.

Case 16-02127-CMB  Doc 225  Filed 02/04/19  Entered 02/04/19 11:52:15  Desc Main
Document    Page 16 of 20

materiality. Accordingly, Mr. Lepre failed to meet his burden under §727(a)(4)(A), and the Court will proceed to assess the remaining counts asserted under §523.

Notably, the statutory exceptions to discharge under §523 are generally construed in favor of debtors with the goal of providing debtors with a fresh start. *Sibbet v. Presutti* (*In re Presutti*), 540 B.R. 154, 170 (Bankr.W.D.Pa. 2015). As the creditor opposing the discharge of this debt, Mr. Lepre has the burden of establishing that the obligation is not dischargeable. *Id.*

Pursuant to §523(a)(2)(A), discharge will not be granted with respect to a debt "for...property…to the extent obtained by – false pretenses, a false representation, or actual fraud…." As before, Mr. Lepre bears the burden of proving the requisite elements by a preponderance of the evidence. *See Pearsall v. Pearsall* (*In re Pearsall*), No. 14-1068-TPA, 2016 WL 3976479, at *6, 2016 Bankr. LEXIS 2644, at *19 (Bankr.W.D.Pa. July 19, 2016).

The statute addresses property obtained by false pretenses, a false representation, or actual fraud. "[T]he distinction between a false representation and a false pretense is that the former is an express statement while the latter is an implied misrepresentation or a product of conduct by the debtor that fostered a false impression." *Id*. In this case, Mr. Lepre fails to identify a particular false statement or implied misrepresentation upon which he relies in support of this count. Nonetheless, there is no evidence in support of either.

As to "actual fraud" under the statute, that has been held to encompass other forms of fraud that do not require a false representation. *See Husky International Electronics, Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016). With respect to excepting a debt from discharge for property obtained by actual fraud, "a creditor must prove that a debtor took some action in furtherance of his wrongful intent, that the fraudulent action enabled him to obtain…property… and that the debt arose in the context of the fraudulent scheme." *See Insinger Performance, Inc. v. Sheaffer* (*In re Sheaffer*), No.

16

1:16-ap-00143-MDF, 2017 WL 377941, at *4, 2017 Bankr. LEXIS 218, at *9 (Bankr.M.D.Pa. Jan. 25, 2017).

Here, Mr. Lepre contends that the Debtor obtained his property fraudulently, and therefore, the resulting debt should be deemed nondischargeable. However, the record is devoid of credible evidence in support of Mr. Lepre's contentions. Mr. Lepre's property remained at the residence shared by the parties prior to the PFA Order. Pursuant to the PFA Order, contact by Mr. Lepre was permitted only for the purpose of securing the return of the property belonging to him. The Debtor credibly testified that Mr. Lepre did not comply with the PFA Order, she had no intention of depriving him of his property, and the property was in the shed waiting for him if he would make appropriate arrangements.[16] Accordingly, Mr. Lepre failed to meet his burden to establish nondischargeability pursuant to §523(a)(2)(A).

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"

> Section 523(a)(4) effectively presents three distinct causes of action: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny. To establish grounds for nondischargeability based on fraud or defalcation, the debtor must be acting as a fiduciary. Proof of a fiduciary relationship is not required for claims alleging embezzlement or larceny.

*Presutti*, 540 B.R. at 170.

---

[16] As noted above, Debtor's reliance on a technicality to deny Mr. Lepre the recovery of a Harley Davidson sign and the attached light fixture in February 2018 only fueled this ongoing fire. As may be typical of parties whose romantic relationship ended in such a volatile way, the parties have been equally obdurate at times. For instance, Mr. Lepre pursued the return of a Wii video game system purchased for Debtor's daughter as a Christmas gift. Transcript, at 38. Nonetheless, it is not enough to say that Debtor was fraudulently retaining these two items that she never understood to be sought by Mr. Lepre until he came to retrieve listed property in February 2018. *See* Transcript, at 60-63. It is also noteworthy that these items of nominal value appear to have been purchased for a total price of less than $40.00. See Exhibit 9. Significantly, even Mr. Lepre appears to concede that these are the only items he established as remaining at the Clara Street Property at the time of trial. Transcript, at 124.

17

*Even if* the Court were to accept Mr. Lepre's contention that a fiduciary relationship was created by entry of the PFA Order, the Court finds that neither fraud nor defalcation was established. Based upon the reasons expressed *supra*, the Court finds no credible evidence of fraud. As to defalcation, the term includes knowingly improper conduct as well as reckless conduct, i.e., disregard of a substantial and unjustifiable risk that the conduct violates a fiduciary duty. *See Aiello v. Aiello* (*In re Aiello*), 660 F.App'x 179, 183 (3d Cir. 2016). Here, as to property indisputably owned by Mr. Lepre, Debtor placed the items in a shed constructed by Mr. Lepre. To the extent Mr. Lepre complains about the condition of the items by the time he was able to retrieve them, the Court is not persuaded that any damage or deterioration of Mr. Lepre's property is due to either intentionally improper conduct by the Debtor or her reckless disregard for the property in her possession. Even Mr. Lepre's testimony supports this conclusion. Transcript, at 101 ("[My property] was, you know, just left out in the open for the elements to be. I mean, I don't know if that was her intention or what the case may be, but that's where it was.") Based upon the credible evidence, the passage of time and condition of the shed were likely the culprits for any wear and tear on these items. Notably, timely compliance with the terms of the PFA Order could have avoided these issues. As Mr. Lepre failed to establish that Debtor refused to comply with the PFA Order and based on Debtor's credible testimony that Mr. Lepre's contact with her was not confined to securing the return of property, Mr. Lepre failed to meet his burden.

As set forth above, §523(a)(4) also excepts from discharge debts for embezzlement and larceny. To establish embezzlement, a plaintiff must prove that a debtor appropriated property, which was lawfully received, for the debtor's own benefit with fraudulent intent or deceit. *See Sheaffer*, 2017 WL 377941, at *3, 2017 Bankr. LEXIS 218, at *7. Larceny requires the same showing, except that the initial appropriation of property must be wrongful. *See Sheaffer*, 2017

18

WL 377941, at *3, 2017 Bankr. LEXIS 218, at *7-8. Once again, due to the lack of any fraudulent intent or deceit, these allegations likewise fail. Furthermore, there is no evidence to support Debtor's taking or use of Mr. Lepre's property for her own benefit. Based on the credible evidence, Mr. Lepre's possessions were collected from the residence, placed in the shed, and awaited retrieval. No credible evidence was presented to support allegations of disposal or misuse of Mr. Lepre's property.

Finally, the Court will consider whether the debt is nondischargeable pursuant to §523(a)(6) as a debt "for willful and malicious injury by the debtor…to the property of another entity[.]" The standard has been set out by this Court as follows:

> As to the willfulness component, §523(a)(6) requires more than simply a deliberate or intentional act causing injury. The actor must have either "purposefully inflicted the injury or acted with substantial certainty that injury would result." As to the malice requirement, the act resulting in the injury must be "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will."

*Wann v. Sosso (In re Sosso)*, 516 B.R. 303, 314 (Bankr.W.D.Pa.2014) (citations omitted). The record simply does not support a finding of nondischargeability under this provision. There is no evidence to support intentional injury to Mr. Lepre's property. Rather, the Court finds Debtor's intention to collect Mr. Lepre's belongings from the residence and maintain them in the shed constructed by Mr. Lepre was a logical effort by Debtor in preparation for a smooth turnover of property pursuant to the PFA Order. While that never occurred, there is simply no basis to conclude that Debtor intended any harm to the property. Unfortunately, due to passage of time and the deterioration of the shed, Mr. Lepre's property may have been harmed. That, however, is insufficient to meet the burden under the statute.

<u>Conclusion</u>

Based on the foregoing, the relief sought in the Amended Complaint must be denied. The Court finds no basis to deny Debtor's discharge or except Mr. Lepre's debt from discharge. An Order will be entered consistent with this Memorandum Opinion.

Date: <u>February 4, 2019</u>             <u>   /s/ Carlota M. Böhm              </u>
                                            Carlota M. Böhm
                                            Chief United States Bankruptcy Judge

**MAIL TO:**

Office of the United States Trustee

Calaiaro Valencik
428 Forbes Ave., Suite 900
Pittsburgh, PA 15219

Gerald S. Lepre, Jr.
1922 Kenneth Avenue
Arnold, PA 15068